IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TOM TUDUJ,

Plaintiff,

v.                                              Case No. 17-cv-0219-NJR-GCS

REYNAL CALDWELL, SAMUEL
NWAOBASI, JOHN TROST, STEPHEN
RITZ, WEXFORD HEALTH SOURCES,
INC., and FRANK LAWRENCE,

Defendants.[1]

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a motion for summary judgment filed by Defendants

Samuel Nwaobasi, John Trost, Reynal Caldwell, Stephen Ritz, and Wexford Health

Sources, Inc. (Docs. 116, 117, 120 & 148). Tuduj opposes the motion (Docs. 143 & 149). For

the reasons set forth below, the Court grants the motion for summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Tom Tuduj ("Tuduj"), an inmate of the Illinois Department of Corrections

("IDOC") incarcerated in Menard Correctional Center ("Menard"), filed a *pro se* lawsuit

pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights (Doc. 1). Tuduj

alleges he was provided inadequate medical care for a systemic virus or infection that

has damaged his eyes causing excruciating pain, migraine headaches, and sensitivity to

light. Tuduj also contends that he was not prescribed medications for his condition

---

[1] Frank Lawrence, Acting Warden of Menard, was substituted as a defendant for the former Warden of
Menard, Jacqueline Lashbrook (Doc. 198).

because it is not on the pharmacy formulary. Following a screening of the complaint pursuant to 28 U.S.C. § 1915A on March 8, 2017, the undersigned allowed Tuduj to proceed on an Eighth Amendment deliberate indifference to a serious medical need claim against Eric Johnson, Christine Lochhead, Samuel Nwaobasi, John Trost, and Stephen Ritz (Doc. 4).[2] The Court also directed that Jacqueline Lashbrook, then warden at Menard, be joined for injunctive relief purposes (Doc. 4).

On April 18, 2018, Magistrate Judge Donald G. Wilkerson granted Tuduj leave to add Dr. Els, Dr. Caldwell, and Wexford Health Source, Inc. ("Wexford") as defendants to Tuduj's claim of deliberate indifference to a serious medical need, but denied Tuduj leave to add Boswell Pharmacy as a defendant (Doc. 69). Thereafter, the undersigned affirmed Judge Wilkerson's order on August 3, 2018 (Doc. 97).

Defendants now move for summary judgment, arguing that the medical evidence reveals that Tuduj does not have shingles and that Defendants were not deliberately indifferent to Tuduj's medical needs. Tuduj counters that the evidence shows he has an objectively serious condition Varicella-Zoster virus, or shingles, and that defendants were deliberately indifferent to his medical needs. Further, Tuduj contends that Wexford was deliberately indifferent to his medical needs in that it instituted a longstanding policy or practice in Menard of no sunglasses based on subjective complaints.

The following facts are taken from the record and presented in the light most favorable to Tuduj, the non-moving party, and all reasonable inferences are drawn in his favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

---

[2] Johnson and Lochhead settled the claims against them and have been dismissed with prejudice from this case (Docs. 108 & 128, respectively).

Tuduj has a long history of medical issues. Since June 2009, he has been incarcerated at Menard. Defendant Samuel Nwaobasi was a licensed physician in the State of Illinois and was employed by Wexford as a physician at Menard from May 2009 to September 2014. Defendant John Trost is a licensed physician in the State of Illinois and was employed by Wexford as the Medical Director at Menard from November 25, 2013 to March 17, 2017. Defendant Reynal Caldwell is a licensed physician in the State of Illinois and has been employed by Wexford as a Traveling Medical Director on an as needed basis since May 18, 2015. Defendant Stephen Ritz is a Doctor of Osteopathic Medicine and has been employed by Wexford as the Corporate Utilization Management Director since September 2014. Defendant Wexford contracts with a division of the State of Illinois to provide certain medical services to certain inmates with the Illinois Department of Corrections.

Tuduj alleges that, since May 17, 2006, the date of the crime for which he is currently incarcerated, he has suffered from a "systemic infection" of the Varicella-Zoster or shingles virus (Doc. 117-5, p. 5). Tuduj testified he was first infected with this shingles virus from a childhood vaccine (*Id*. at p. 7). Tuduj alleges the virus remained dormant in his system, except for occasional cold sores, until May 17, 2006, when the virus was activated (*Id*. at p. 24). Tuduj testified "once all the stress and everything of being incarcerated and finding out what happened in my criminal case, learning about what happened, and the unbelievable stress that I was under because of what happened with my family and what happened to the victim in this case, I was devasted and in complete shock. And my understanding is that those are –actually I saw it in a commercial, when those zoster virus or those vaccines that they're putting out there – I saw a commercial—

it was a commercial or Doctor Oz, or one of those TV shows, saw it on TV, that a traumatic event can aggravate or activate this virus." (*Id.*).

Tuduj alleges that the shingles virus causes him to experience rashes on his face and body as well as photophobia (Doc. 71). Tuduj claims that how and when he experiences photophobia "depends on the light, how intense the light is, so it could occur from two minutes to an hour." (Doc. 117-5, p. 27). Tuduj admitted that no medical professional has diagnosed him with shingles or the Varicella-Zoster virus (*Id.* at p. 5, 8). As to the diagnosis, Tuduj testified to the following:

> Q.     Has any doctor ever diagnosed you with a varicella virus?
>
> A.     Well, I kind of reversed engineered the medical diagnosis because unfortunately we aren't getting the top of the line care here. So the way I came to that conclusion is once Dr. Fuentes prescribed doxycycline, I looked it up and saw what it was prescribed for. And once I learned what it was prescribed for, she didn't even really tell me what it was, I saw that it was a zoster virus. And zoster virus was one of the things it was prescribed for, the treatment for it. So then I started looking that up in Black's Medical Dictionary and saw all of the symptoms that were listed were consistent with what I'm experiencing. And so, once I connected those two, that's how I came to the conclusion that that's what it was.
>
> Q.     Okay. I'm gonna – I understand. I'm gonna ask you the question again. But no doctor's ever told you that you have a varicella virus?
>
> A.     No, sir.

(*Id.* at. p. 5). Tuduj further testified that he has no formal medical training and that any medical knowledge he has, he obtained from review of medical journals, literature and Black's Medical Dictionary (*Id.* at. p. 5, 6).

Tuduj began to experience photophobia immediately following the crime for which he is incarcerated, which occurred on May 17, 2006 (*Id.* at p. 23). Following the May 17, 2006 event, Tuduj was detained at the Cook County Jail awaiting trial. While at

Cook County Jail, Tuduj requested and received a permit, which specifies per inmate request, for sunglasses and his family provided him with a pair of sunglasses (*Id*. at p. 25; Doc. 117-1, p. 1).

Following Tuduj's 2009 conviction, he was initially transferred into Stateville Correctional Center ("Stateville") (Doc. 117-5, p. 9). Upon his arrival at Stateville, Tuduj's sunglasses were taken from him, and he was told "nobody in IDOC can have sunglasses." (*Id*. at p. 9).

On June 25, 2009, Tuduj was transferred to Menard. Thereafter on July 1, 2009, Tuduj visited nurse sick call for complaints of headaches which Tuduj related to a prior chemical brain injury (Doc. 117-1, p. 3). Tuduj was prescribed Motrin and was referred to a medical doctor for further evaluation (*Id*.).

Three days later, on July 4, 2009, Tuduj saw Dr. Nwaobasi. At that time, Tuduj complained of "off and on headaches for the past three years" due to a previous drug reaction (*Id*. at p. 3). The medical record states that Dr. Nwaobasi assessed Tuduj for chronic chemical substance abuse per Tuduj's complaints and prescribed Motrin. As to this visit on July 4, 2009, Tuduj admitted during his deposition that he did not report any complaints related to his shingles infection or any complaints of photophobia to Dr. Nwaobasi (Doc. 117-5, p. 10).

On September 15, 2009, a nurse practitioner examined Tuduj for complaints of headaches for the past week that would come and go and last from seconds to days (Doc. 117-1 at p. 5). Also, Tuduj reported a prior chemical brain injury that resulted in light sensitivity (*Id*.). The nurse practitioner noted that Tuduj was alert and oriented to time, space and location, in apparent distress, and that an evaluation of his pupils was

unremarkable (*Id*.). The nurse practitioner assessed Tuduj with intermittent headaches and prescribed him Motrin (*Id*.).

A year later, Tuduj visited nurse sick call with complaints of bilateral eye pain and was referred for evaluation with a medical doctor on September 25, 2010 (*Id*. at p. 6). Tuduj was seen by Dr. Fe Fuentes for complaints of bilateral eye pain on September 29, 2010 (*Id*. at p. 7). During this examination, Tuduj complained of pain in both eyes due to exposure to light and requested a permit for sunglasses (*Id*.). Dr. Fuentes noted that Tuduj was well nourished, in no apparent distress, and his pupils were unremarkable (*Id*.). Dr. Fuentes told Tuduj that sunglasses were not allowed at Menard and referred him to the Optometry Clinic for further evaluation (*Id*.).

On November 9, 2010, Tuduj was evaluated by Optometrist Dennis Els (*Id*. at p. 8). At this visit, Tuduj complained of a prior brain injury which caused him to experience photophobia (*Id*.). Dr. Els performed an examination of Tuduj's eyes and noted his eyes were unremarkable without any evidence of infection (*Id*.).

Next, Tuduj visited nurse sick call on February 6, 2011 for complaints of severe cold sores on his lower lip and was referred for an evaluation with a medical doctor (*Id*. at p. 9). On February 10, 2011, Dr. Magid Fahim evaluated Tuduj for complaints of a cold sore for the past two weeks with no past medical history of cold sores (*Id*. at p. 10). Dr. Fahim noted that Tuduj's upper and lower lips were red and swollen (*Id*.). Dr. Fahim diagnosed Tuduj with a cold sore with secondary infection in the form of cellulitis of the lips (*Id*.). Dr. Fahim prescribed Tuduj Doxycycline, Acyclovir, a triple antibiotic ointment, and scheduled a follow-up in two weeks (*Id*.).

Tuduj followed up with Dr. Fahim on February 28, 2011 reporting that the cold sore was improving but that he did not take the medications (Doxycycline and Acyclovir) as prescribed to him during the previous visit (*Id.* at p. 11). Dr. Fahim noted that the cold sore was improving and recommended that Tuduj continue to use the triple antibiotic ointment and return to healthcare as necessary (*Id.*). As to this visit, Tuduj testified:

> Q. ... And then it says, patient not using meds as prescribed. The last line in the that center column.
> A. Yes.
> Q. So you were not taking your medications?
> A. Well, what occurred is obviously I have ... which is the fear of physician drug induced disease through side effects.
> 
> ...
> 
> ... And I did eventually start taking them after I got the patient medication information on what the side effects were.

(Doc. 117-5, p. 44). Tuduj testified that these medications were ineffective at alleviating his complaints (*Id.* at p. 42).

Tuduj then saw Dr. Fuentes on August 2, 2011 for right shoulder pain and for renewal of low bunk and low gallery permits (Doc. 117-1, p. 12). As a result of this visit, Dr. Fuentes renewed the permits and ordered an x-ray of Tuduj's shoulder. The x-ray was taken on August 11, 2011 (*Id.* at p. 12, 13).

Next, Dr. Nwaobasi saw Tuduj on August 29, 2011 for the follow-up of his right shoulder (*Id.* pp. 14, 15). Dr. Nwaobasi reviewed the x-ray results which revealed a high riding humerus and down sloping acromion with mild osteoarthritis of the glenohumeral and AC joints of Tuduj's right shoulder (*Id.*). Dr. Nwaobasi assessed Tuduj with possible rotator cuff impingement syndrome and prescribed him Motrin and Robaxin; Tuduj declined the Robaxin (*Id.*). Dr. Nwaobasi also issued Tuduj front cuff permit and

recommended Tuduj follow up in six months (*Id*.). Tuduj testified that he did not report complaints relating to any infection, virus, rash, or eyes during this visit (Doc. 117-5, p. 11).

Three months later, Dr. Lochhead saw Tuduj (Doc. 117-1, p. 16). During this visit, Tuduj complained about photophobia and eye strain, as well as a history of Serotonin Syndrome, a condition caused by increased amounts of serotonin in the body due to certain medications or drugs which can cause confusion, restlessness and irritability (*Id*.). Dr. Lochhead performed an ocular examination which was unremarkable (*Id*.). Dr. Lochhead determined that Tuduj had presbyopia (loss of the flexibility in the lens with age causing difficulty focusing on close objects) and prescribed Tuduj reading glasses (*Id*.).

Tuduj saw Dr. Nwaobasi again on February 2, 2012 for the renewal of the front cuff permit (*Id*. at ps. 17, 18). Tuduj also complained about photophobia (*Id*.). After examining Tuduj, Dr. Nwaobasi found Tuduj obese with limited range of motion in his right shoulder and an inability to cross his hands behind his back (*Id*.). Based on patient complaints, Dr. Nwaobasi renewed the front cuff permit and referred Tuduj to the optometry clinic at Menard for further evaluation of the photophobia (*Id*.). Tuduj testified that this is the first time he reported complaints of photophobia to Dr. Nwaobasi and that he takes no issue with Dr. Nwaobasi's decision to send him to the Optometry Clinic to address his photophobia complaints (Doc. 117-5, p. 11).

Five days later, Tuduj was evaluated by Dr. Johnson in the Menard Optometry Clinic (Doc. 117-1, p. 19). Tuduj complained about extreme photophobia for the past four to five months with episodes lasting from six hours to three days (*Id*.). Tuduj also

complained of serotonin syndrome. Dr. Johnson found possible episodes of iritis per Tuduj's complaints, without any sign of current inflammation and told Tuduj to return immediately to the Optometry Clinic if he has further episodes of photophobia (*Id*.). Dr. Johnson prescribed Tuduj transition lenses and offered to Tuduj eye drops, which Tuduj refused (*Id*.).

On July 5, 2012, Dr. Johnson ordered Tuduj a new set of transition lenses after Tuduj reported that the current lenses were not transitioning (*Id*. at. p. 20).

Tuduj saw Dr. Nwaobasi for renewal of his low bunk and low gallery permits on July 16, 2012 (*Id*. at p. 21, 22). Dr. Nwaobasi found status-post right knee surgery with limited range of motion in both lower extremities and issued the low bunk and low gallery permits for one year (*Id*.). Tuduj testified that he did not complain about shingles infection or photophobia at this time (Doc. 117-5, p. 12).

In November 2012, Dr. Johnson in the Optometry Clinic and they discussed serotonin syndrome (Doc. 117-1, p. 23).

In August 27, 2013, Tuduj saw Dr. Nwaobasi for right shoulder pain (*Id*. at p. 24). Dr. Nwaobasi reviewed the August 2011 right shoulder x-rays; found extensive degenerative osteoarthritis of the right shoulder; and prescribed Naprosyn. Tuduj told Nwaobasi that he would only take Motrin (*Id*.). Dr. Nwaobasi then prescribed Tuduj Motrin and told him to follow up (*Id*.). Tuduj testified that the medical records fail to mention any complaints related to shingles or photophobia (Doc. 117-5, p. 46). Tuduj also testified that he does not have a specific recollection telling Dr. Nwaobasi about shingles or photophobia during the visit (*Id*. at p. 49).

Dr. Lochhead saw Tuduj on October 5, 2013. He complained about serotonin syndrome (Doc. 117-1, p. 25). Dr. Lochhead found no signs of photophobia on pupil or fundus testing and Tuduj refused visual acuity testing (*Id*.). Thereafter, Tuduj saw Dr. Lochhead on December 21, 2013 (*Id*. at p. 26) and on March 7, 2014 (*Id*. at p. 27). During the March 2014 visit Tuduj complained of extreme photophobia. Dr. Lochhead performed a physical examination which was unremarkable (*Id*.). Dr. Lochhead found no ocular reason for Tuduj's complaints and recommended he visit the healthcare center for an evaluation for his migraines (*Id*.).

On June 11, 2014, Tuduj went to nurse sick call for headaches and eye issues including photophobia (*Id*.). Tuduj was referred to a medical doctor (*Id*.). Two days later, Dr. Nwaobasi saw Tuduj for complaints of recurrent cold sores and general intolerance to hot and cold temperatures. After examining Tuduj, Dr. Nwaobasi was unable to identify any cold sores (*Id*.). Tuduj reported the sores responded to Neosporin and hydrogen peroxide (*Id*.). Dr. Nwaobasi, per Tuduj's complaints of hot and cold, prescribed hydrogen peroxide serum to be applied to the affected area and told Tuduj to come back as necessary (*Id*.). This is the last time Tuduj saw Dr. Nwaobasi. Tuduj testified that this is the only time he complained about a rash (Doc. 117-5, p. 15). Tuduj also testified that he did not receive the prescription for hydrogen peroxide because security would not allow it (*Id*. at. p. 14).

On July 2, 2014, a registered nurse responded to a grievance from Tuduj requesting renewal of his permit for transition lenses (Doc. 117-1, p. 30). The nurse noted that Tuduj saw Dr. Nwaobasi on June 13, 2014 and Tuduj did not ask for the transition lenses to be

renewed (*Id*.). The nurse told Tuduj to submit a sick call to the eye doctor that previously issued the permit (*Id*.).

On August 1, 2014, Dr. Lochhead saw Tuduj for reports of headaches and continued photophobia (*Id*. at p. 31). Dr. Lochhead performed an examination which was unremarkable and told Tuduj to visit healthcare for further treatment for headaches (*Id*.).

On August 12, 2014, another registered nurse responded to a grievance from Tuduj concerning Dr. Nwaobasi's prescription for hydrogen peroxide (*Id*. at p. 32). The nurse noted that inmates are not allowed to have hydrogen peroxide in the cell (*Id*.).

Dr. Fuentes saw Tuduj on August 22, 2014 for complaints of blood pressure elevation after testing revealed diastolic levels and photophobia (*Id*. at p. 33). Dr. Fuentes noted that Tuduj was well nourished, lungs were clear, heart rate and rhythm normal and an examination of his pupils was unremarkable (*Id*.). Per Tuduj's complaints of photophobia, Dr. Fuentes told him to follow up as necessary (*Id*.).

Two days later, Tuduj visited sick call for a severe rash which he associated with the shingles on and off for several months and requested cream (*Id*. at p. 34). After examining Tuduj, the nurse did not find Tuduj to have an active rash, fever or any signs of itching (*Id*.).

Thereafter, Tuduj saw Dr. Fuentes on September 17, 2014 and he asked for Dimethysul Sulfoxide ("DMSO") to treat breakouts on his face and lips which Tuduj claimed caused sensitivity to his eyes (*Id*. at p. 35). After examining Tuduj, Dr. Fuentes noted that he was nourished with erythema (or redness) on his face (*Id*.). Dr. Fuentes prescribed DMSO after meals for one month (*Id*.). DSMO is a chemical byproduct of the papermaking process that is FDA approved for the treatment of painful bladder

syndrome (Doc. 120, p. 9). It has also been marketed as an alternative medication for the treatment of various conditions without FDA approval (*Id.*).

On November 6, 2014, Tuduj saw a nurse practitioner and he asked for an update on the status of his DMSO prescription (*Id.* at p. 36). The nurse practitioner told Tuduj he would check on the status of the DMSO and prescribed him triple antibiotic ointment (*Id.*). Subsequently on November 21, 2014, Dr. Fuentes completed a review of Tuduj's medical chart and discontinued the previous prescription for DMSO noting the pharmacy would not fill it (*Id.* at p. 37).

On December 31, 2014, a registered nurse, responding to a grievance wherein Tuduj requested dark lenses and DMSO, noted that the eye doctor does not see the need for dark glasses and that the pharmacy will not send the DMSO. The nurse referred Tuduj to the medical director for alternate care (*Id.*).

Next, Tuduj saw Dr. Trost for the first time on January 20, 2015 and requested a prescription for DMSO (*Id.* at p. 38). Dr. Trost noted that DMSO was not available (*Id.*).

Tuduj saw Trost again on March 23, 2015 and requested a renewed low bunk and low gallery permits (*Id.* at p. 39). During this visit, Tuduj did not report any complaints related to shingles or photophobia (*Id.*). Dr. Trost renewed the permits (*Id.*).

On July 2, 2015, Tuduj saw Dr. Kehoe in the Menard Optometry Clinic (*Id.* at p. 41). Dr. Kehoe noted that Tuduj's lenses were not transitioning very well (*Id.*). Dr. Kehoe noted Scotoma Syndrome; ordered Tuduj new lenses; and recommended a follow-up in December (*Id.*).

Thereafter, Dr. Trost saw Tuduj on September 4, 2015 asking for DMSO for a facial rash (*Id.* at p. 42). Dr. Trost denied the request (*Id.*).

Subsequently, on October 22, 2014, Dr. Kehoe sent a request to Collegial to provide Tuduj with a new pair of transition lenses or a pair of rubber sunglasses (*Id*. at ps. 43, 44).

On October 26, 2014, a nurse saw Tuduj because of chicken pox or shingles symptoms (*Id*. at p. 45). The nurse noted that Tuduj did not have a rash, fever or general malaise, that Tuduj did not have signs of itching, and that Tuduj did not have a rash associated with Chicken Pox. (*Id*.).

On October 29, 2014, Collegial discussed the referral request for the sunglasses (*Id*. at p. 46). During Collegial, Dr. Ritz requested additional information regarding Tuduj's permit for transition lenses and left the request pending review of the additional records (*Id*.). On November 12, 2015, the request to provide Tuduj with rubber sunglasses was discussed with Dr. Ritz in Collegial (*Id*. at pp. 47-49). After review of the additional information, Dr. Ritz denied the request and recommended continued observation as Tuduj did not meet the criteria for sunglasses based on the current diagnosis of Scotoma Syndrome, despite the fact that Tuduj's overall visual acuity was 20/20 bilaterally (*Id*.).

Dr. Kehoe examined Tuduj on January 22, 2016 for complaints of photophobia and complaints of his transition lenses not darkening enough (*Id*. at p. 50). Dr. Kehoe ordered a pair of post-operative sunglasses and issued a permit to have these glasses in the cellhouse (*Id*.).

Next, Tuduj saw Dr. Trost on February 26, 2016 for renewal of his low bunk and gallery permits (*Id*. at p. 51). Dr. Trost denied the permits because Tuduj did not meet the requirements for the permits (*Id*.). This is the last time Tuduj saw Dr. Trost.

On March 25, 2016, Tuduj saw Dr. Kehoe because he had not received the post-operative sunglasses (*Id*. at p. 52). Dr. Kehoe informed Tuduj that the post-operative

sunglasses will be available the next week and issued him a permit for post-operative glasses (*Id.*). Tuduj received the post-operative sunglasses in April 2016 (Doc. 117-5, p. 7). These glasses help provide Tuduj relief; but he still has pain at various times (*Id.*).

Dr. Caldwell saw Tuduj one time on November 27, 2016 (Doc. 117-1, p. 53). During this visit, Tuduj requested testing for Giardia, a microscopic parasite that causes diarrheal illness known as giardiasis, and a referral to an ophthalmologist (*Id.*). Dr. Caldwell did not test Tuduj for Giardia; but Dr. Caldwell did refer him to Dr. Trost for consideration of an ophthalmologist referral (*Id.*).

The Medical Director, physicians and nurse practitioners at Menard are not involved in scheduling patients for MD sick call or for evaluations with a physician.

### Preliminary Matter

On January 25, 2019, Defendants filed a suggestion of death as to Defendant Samuel Nwaobasi, indicating that Dr. Nwaobasi passed away on October 22, 2018 (Doc. 165). The Court then set a deadline of February 27, 2019 for counsel to attempt to identify and effectuate personal service provided by Rule 4 upon Dr. Nwaobasi's next of kin or personal representative (Doc. 168). On February 22, 2019, defense counsel indicated that Dr. Nwaobasi's next of kin, Mrs. Margaret Nwaobasi, was served with the Suggestion of Death (Doc. 175). The Court then set a 90-day deadline for a motion for substitution (Doc. 176). The Court indicated that, if no motion for substitution is made, Tuduj's claims against Dr. Nwaobasi will be dismissed pursuant to Rule 25(a) (Doc. 176).

On April 29, 2019, Tuduj filed a "Motion for Leave to Substitute Parties" (Doc. 185). In the motion, he explains that he will not substitute Dr. Nwaobasi's widow for "moral" reasons. Instead, Tuduj asks the Court to substitute Evanston Insurance Company or

Wexford Health Sources, Inc. (*Id*.). Defendants filed a response in opposition to the motion, arguing that Evanston Insurance Company is not a proper party for substitution under Rule 25(a)(1), and Wexford cannot be substituted on the basis of *respondeat superior* liability because there is no *respondeat superior* liability under 42 U.S.C. § 1983 (Doc. 186).

On June 17, 2019, Tuduj filed a "Motion or Leave to Supplement Doc. 185 and Voluntarily Dismiss Decedent Defendant" (Doc. 195). In that motion, Tuduj explains that, because he is unable to authenticate the Certificate of Death filed by counsel, he requests leave to voluntarily dismiss Dr. Nwaobasi pursuant to Federal Rule of Civil Procedure 41(a)(2) without prejudice (*Id*.).

In light of Tuduj's recent "Motion for Leave to Supplement Doc. 185 and Voluntarily Dismiss Decedent Defendant" (Doc. 195), the Court denies as moot his original "Motion for Leave to Substitute Parties" (Doc. 185). Because no motion to substitute has been filed or remains operative, the Court finds that dismissal is appropriate. Thus, pursuant to Rule 25(a)(1), the Court dismisses with prejudice Tuduj's claims against Dr. Samuel Nwaobasi. In light of this ruling, the Court grants in part and denies in part Tuduj's "Motion for Leave to Supplement Doc. 185 and Voluntarily Dismiss Decedent Defendant."

## ANALYSIS

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014), *citing* FED. R. CIV. P. 56(a). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of

material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobbby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

The Supreme Court has recognized that deliberate indifference to the serious medical needs of prisoners may constitute cruel and unusual punishment under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate he suffered from an objectively serious medical condition. *Id.* at 591-592. Second, the plaintiff must establish the individual prison officials were deliberately indifferent to that condition. *Id.*

The first consideration is whether the prisoner has an "objectively serious medical condition." *Arentt v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir.

2014)(citations omitted). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires 'deliberate indifference to a *substantial* risk of *serious* harm") (internal quotation marks omitted) (emphasis added)).

To show prison officials acted with deliberate indifference, a plaintiff must put forth evidence that prison officials not only knew that the prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id. Accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (stating that "[d]eliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (stating that "negligence, even gross negligence does not violate the Constitution.").

Assessing the subjective prong is more difficult in cases alleging inadequate health care as opposed to lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-06 (7th Cir. 2016)). This is contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[] that [he] did," *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016) (alterations in the original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). The Eighth Amendment does not require that prisoners receive "unqualified access to health care[.]" Rather, they are entitled only to "adequate medical care." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

The Seventh Circuit has held that a corporate entity violates an inmate's constitutional rights only when it has a policy that creates conditions that infringe upon an inmate's constitutional rights. *See Woodward v. Corr. Med. Serv. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). *See also Jackson v. Ill. Med-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002) (private corporation is treated as though it were a municipal entity in a Section 1983 action). Absent a deprivation of a constitutional right, the claim fails. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012).

Here, Defendants maintain that there is no evidence that Tuduj has an objectively serious medical condition. Tuduj claims that he suffers from an infection of the Varicella-Zoster virus, or shingles, which causes him to experience rashes on his face and body as well as severe photophobia. Tuduj admits that no medical professional has ever diagnosed him with the shingles or an infection of the Varicella-Zoster virus. Instead, Tuduj admits he self-diagnosed himself by "reverse engineering" prescriptions he

received from Dr. Fahim in 2011, which Tuduj admits he did not take as prescribed.[3] Tuduj's self-diagnosis is mere speculation and is not sufficient to indicate that he suffers from the shingles or the Varicella-Zoster virus.

The available evidence shows that, since arriving at Menard, Tuduj has been evaluated by numerous physicians, optometrists, nurse practitioners, nurses and other medical staff, none of whom have ever diagnosed or even suggested that Tuduj has an infection of the Varicella-Zoster virus. The medical evidence also reveals Defendants, along with nursing staff, on numerous occasions after seeing Tuduj, did not find that he presented with a rash or even cold sores despite Tuduj's many complaints. As to the rash, the record does not contain any evidence that Tuduj had a rash let alone a rash that had the characteristics of shingles. His self-diagnosis, unsupported by any evidence in the record, is not sufficient to withstand summary judgment. *See Fitzgerald v. Greer*, 324 F. App'x 510, 515 (7th Cir. 2009); *Green v. Senkowski*, 100 F. App'x 45, 47 (2d Cir. 2004); *Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994).

Further, there is no medical evidence to link Tuduj's photophobia with the shingles. Beyond mere conjecture, there is no evidence to support Tuduj's contention that he suffers from a systemic infection of the Varicella-Zoster virus/shingles and he cannot establish that he has a subjectively serious medical condition diagnosed by a physician as mandating treatment.

Even assuming *arguendo* that Tuduj has established that he has a serious medical condition, which he has not, the Court finds that Tuduj has not demonstrated that

---

[3] Tuduj admitted that he initially he did not take the medications as prescribed to him until after he had the chance to research the side effects of the drugs (Doc. 117-5 ps. 20, 21).

Defendants Trost and Ritz were deliberately indifferent to his medical needs regarding his eyes. The record reveals that these doctors provided appropriate medical treatment to Tuduj; the medical treatment simply was not the treatment Tuduj wanted/demanded. Over the various visits, the doctors in addressing Tuduj's many ailments did prescribe him with Motrin; renewed his low bunk and gallery permits, renewed requests for front cuffs; referred him to optometrists/ophthalmologists for further visits, and prescribed him medications, which at times Tuduj refused to take. These Defendants addressed and treated Tuduj's subjective complaints despite the lack of evidence (*i.e.* no rash or cold sores) to support his subjective complaints.

The evidence, when viewed in the light most favorable to Tuduj, demonstrates merely that Tuduj wanted different care than the prison medical professionals recommended. But Tuduj is not entitled to "demand specific care" and his dissatisfaction and disagreement with the prison medical professionals suggested course of treatment does not establish deliberate indifference. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011); *Johnson*, 433 F.3d at 1013; *Pyles*, 771 F.3d at 409. The Court concludes that Tuduj's deliberate indifference claims against Defendants lack an arguable basis in fact such that no reasonable person could suppose it to have any merit. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989); *Lee v. Clinton*, 209 F.3d 1025, 1026-27 (7th Cir. 2000). As such, Defendants are entitled to summary judgment.

Clearly, the record does not contain evidence that any of Defendants' treatment of Tuduj was so inappropriate or that their treatment was a substantial departure from accepted professional judgment, practice or standards. Even construing the facts in the light most favorable to Tuduj, the medical records do not support Tuduj's subjective

complaints regarding a "systemic infection" of the Varicella-Zoster virus/shingles.

Next, Tuduj's claims that Wexford instituted a longstanding policy or practice at Menard by denying him medical eye care as a result of the no sunglasses policy based on subjective complaints. First, the Court finds that Tuduj cannot prevail on this claim against Wexford as explained *supra* because Tuduj has not demonstrated the individual Defendants violated his constitutional rights. Second, Tuduj offers no evidence that such a policy or practice exists.

In fact, the evidence reveals that Wexford's Optometry guidelines provide for the provision of tinted lens or sunglasses as medically necessary. Wexford's guidelines allow tinted lenses for the following medical conditions: (a) Albinism; (b) Chronic/Recurrent Iritis (inflammation of the iris of the eye); (c) Fixed/Dilated Pupils (a condition where the pupils do not respond to light or other stimuli); (d) Iris Abnormality (abnormality of the iris of the eye resulting from trauma, infection, neoplasm, or genetic reasons); and (e) other medical conditions on an as needed basis. Complaints of photophobia are not an indication for tinted lenses or sunglasses.

After reviewing the medical records and the request for the rubber sunglasses, Dr. Ritz in Collegial denied the request and recommended continued observation because Tuduj did not meet the criteria for sunglasses based on his current diagnosis of Scotoma Syndrome, despite the fact that Tuduj's overall visual acuity was 20/20 bilaterally. Further, the record reveals that Tuduj did receive transition lenses and that he eventually did receive post-operative glasses in April 2016. The evidence does not suggest that Wexford had a policy that prohibited eye doctors from prescribing tinted lenses.

As a final matter, Frank Lawrence was substituted as a Defendant for Jacqueline

Lashbrook, the former Warden of Menard, who was added to this lawsuit for the sole purpose of perfecting any injunctive relief. Because Defendants are entitled to summary judgment as a matter of law on Tuduj's Eighth Amendment claim of deliberate indifference, Defendant Lawrence is also entitled to summary judgment at this juncture.

CONCLUSION

For these reasons, the Court **GRANTS** the motion for summary judgment (Doc. 116) filed by Defendants. The Court also **DENIES as moot** the "Motion for Leave to Substitute Parties" filed by Tuduj (Doc. 185), and **GRANTS in part and DENIES in part** the "Motion for Leave to Supplement Doc. 185 and Voluntarily Dismiss Decedent Defendant" (Doc. 195). Defendant Samuel Nwaobasi is **DISMISSED with prejudice** pursuant to Rule 25(a)(1).

As no claims remain pending, judgment shall be entered in favor of Defendants John Trost, Reynal Caldwell, Stephen Ritz, Wexford Health Sources, Inc., and Frank Lawrence and against Plaintiff Tom Tuduj. The Clerk of the Court shall close this case and enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:   September 30, 2019**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**